**E-Filed 1/26/2007**

NOT FOR CITATION

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| SYSTEMS AMERICA, INC., et al., <br><br>                  Plaintiffs, <br><br>      v. <br><br>ROCKWELL SOFTWARE, INC., et al., <br><br>                  Defendants. | Case Number C 03-02232 JF (RS) <br><br> ORDER[1] GRANTING PARTIAL MOTION TO DISMISS WITHOUT LEAVE TO AMEND <br><br> [re: docket no. 87] |
| ROCKWELL AUTOMATION, INC., <br><br>                  Third Party Plaintiff, <br><br>      v. <br><br>VERSANT CORPORATION, <br><br>                  Third Party Defendant. | |

Third party defendant Versant Corporation ("Versant") moves to dismiss the second and third claims for relief contained in the First Amended Third Party Complaint ("FATPC") filed by third party plaintiff Rockwell Automation, Inc. ("Rockwell Automation"). For the reasons discussed below, the motion will be granted without leave to amend.

---

[1] This disposition is not designated for publication and may not be cited.

**I. BACKGROUND**

1. Procedural Background

Plaintiffs Systems America, Inc. and Systems America (I) Pvt. Ltd. (collectively "Systems America") filed the original complaint in this action on May 13, 2003, alleging breach of contract, breach of the covenant of good faith and fair dealing, and misappropriation of trade secrets. On June 26, 2006, Rockwell Software Inc. ("Rockwell Software") answered the complaint. On the same date, Rockwell Automation filed a third party complaint ("TPC") against Versant. The TPC asserted one claim for breach of contract. Rockwell Automation alleged that Rockwell Software entered into a Software Development Agreement with Versant dated May 9, 2003 ("SDA"), under which Versant was to develop certain software for Rockwell Software.[2] Rockwell Automation alleged that the SDA included a warranty by Versant that its services would not violate or infringe upon the rights of third parties, and that Versant violated this warranty by developing software using trade secrets and confidential information belonging to Systems America.

On October 12, 2006, Rockwell Automation filed the FATPC. The FATPC asserts three claims for relief: (1) breach of contract; (2) breach of warranty of the SDA; and (3) breach of warranty of the RSSQL offshore development proposal ("Proposal"). Versant contends that the second and third claim are not cognizable because the FATPC asserts no basis by which Versant could be obligated under the implied warranty provisions of the Uniform Commercial Code ("UCC"), including California Commercial Code Section 2312 or New York Uniform Commercial Code Section 2-312.[3] Versant argues that the UCC does not apply because both

---

[2] Rockwell Automation alleges that Rockwell Software merged into it on September 13, 2005, and that it is the successor in rights and remedies stemming from the SDA.

[3] Rockwell Automation pleads the second and third causes of action "[p]ursuant to California Commercial Code § 2312, N.Y. U.C.C. 2-312, or other applicable law." The New York and California code sections are identical. The parties have not cited and the Court has not found authority indicating that the case law of the highest New York and California courts differ with regard to the question posed by the instant motion. The parties agree that the Court need not determine at this time which law applies and the Court concludes that it need not do so.

1  agreements at issue address custom software development and thus are contracts for services
2  rather than for the sale of goods.  Rockwell Automation opposes the motion, arguing that the
3  contracts at issue are governed by the UCC because they are contracts for the sale of goods.  The
4  Court heard oral argument on January 19, 2007.

2. <u>Agreements at Issue in the Instant Motion</u>

    a.    The Proposal

The Proposal,[4] entered in to by Rockwell Software and Mokume Software, Inc. ("Mokume")[5] on January 25, 2002, contemplates "development outsourcing."  Under the Proposal, "Rockwell will define the requirements (code development and changes), deliverables from Mokume Software, resources requirements and time line in a 'Statement of Work' (SOW) document."  Proposal ¶ 5.2.  The Proposal has only vague terms, as befits a preliminary document.  However, the existing terms indicate that it is an agreement relating to the development of software.  The Proposal does not define the specific work to be performed by Mokume, but refers to it generally as "development."  The Proposal does not include the SOW, but describes a "Typical SOW" as containing elements which confirm that the Proposal contemplates development.  *See* Proposal ¶ 5.2.  The Proposal refers to Appendix 1 for the scope of the SOW, but this Appendix is blank.

    b.    The SDA

The SDA[6] entered into by Rockwell Software and Versant on May 9, 2003, recites the following:

> A.  Rockwell has developed the software (RSSQL) designed to help better manage manufacturing processes by integrating the valuable data in shop floor control systems with enterprise IT and other manufacturing applications.
> B.  Versant is willing to extend the capabilities of the currently developed RSSql SAP Server by providing a "XML Enterprise Server" for such integration in

---

[4] The Proposal is provided as Exhibit A to the FATPC.

[5] Rockwell Automation alleges that Versant acquired Mokume in October or November 2002.  Systems America alleges that Mokume was formed by a group of its former employees who had committed the alleged theft of source code which has given rise to this action.

[6] The SDA is provided as Ex. B to the FATPC.

accordance with the Requirements and on the terms and conditions set forth herein.

SDA Recitals A-B. The SDA contemplates that Versant will "develop the Software in accordance with the Requirements" articulated therein. SDA ¶ 2.1. The Requirement Statement recites the fact that "Versant has agreed to develop and deliver a 'XML Enterprise Server' and a SAP Enterprise Server for integrating Rockwell's RSSql product with XML and SAP based clients/data sources." SDA Ex. A. Specific requirements include those listed under the heading "RSSql XML Enterprise Server Objectives":

> Versant to provide RSSql development support by building a RSSql XML Enterprise Server:
> 1. Support XML interchange between RSSql data points and any other XML based application/data source.
> 2. Support RSSql interfaces with SAP via the SAP web services initiative, SAP R/3 release 4.6C and higher.
> 3. Support RSSql interfaces with SAP IDoc & Functional Modules for SAP R/3 releases 3.1h through 4.5B.
> 4. Support MSMQ messaging.

SDA Ex. A.

The SDA provides that "Rockwell shall have the right to inspect and test the Software when received to determine whether they conform to the Requirements." SDA ¶ 2.4. Under the SDA, "[t]he parties will jointly develop a 'go-to-market' strategy which may include development of marketing material, hosting seminars, participation in trade shows, customer road shows, and targeted mailings," SDA ¶ 3.1, and "[e]ach party will market and sell the Software under their own brands and box wraps respectively." SDA ¶ 3.2. The SDA includes the "additional responsibilities of Versant" that it "install and customize the Software at the facilities of Rockwell's clients" at agreed-upon rates, SDA ¶ 4.1, that it "provide upgrades to the Software," SDA ¶ 4.2, and that it "provide maintenance to Rockwell and Rockwell's clients" at agreed-upon rates. SDA ¶ 4.3. The SDA provides that "the Software shall be owned exclusively by Versant." SDA ¶ 6.1. Both Rockwell Software and Versant have "the worldwide right to license and install, and distribute the Software through supporting channels." SDA ¶ 6.2. The SDA governs the payment of license revenues, with Versant receiving, for example, sixty percent of net revenue in the first three years from the initial product release date or the term of the SDA.

SDA ¶ 7.2. The SDA provides that Versant will deposit the source code of the software with a designated escrow agent for access by Rockwell Software. SDA ¶ 6.4. The SDA does not include a provision requiring Versant to produce a large number of copies of the Software developed under the SDA or to deliver a large number of copies to Rockwell Software.

## II. LEGAL STANDARD

1. <u>Motion to Dismiss</u>

For the purpose of a motion to dismiss, the plaintiff's allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Department of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995). When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *North Star International v. Arizona Corporation Commission*, 720 F.2d 578, 581 (9th Cir. 1983); *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *Beliveau v. Caras*, 873 F.Supp. 1393, 1395 (C.D. Cal. 1995). However, under the "incorporation by reference" doctrine, the Court also may consider documents which are referenced extensively in the complaint and which are accepted by all parties as authentic, which are not physically attached to the complaint. *In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d 970 (9th Cir. 1999).

2. <u>Scope of the UCC</u>

The UCC applies to "transactions in goods." Cal. Comm. Code § 2102. "Goods" are defined in the Code as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." Cal. Comm. Code § 2105. When a contract involves both goods and services, the Court should look to the essence of the agreement, *Filmservice Laboratories, Inc. v. Harvey Bernhard Enterprises, Inc.*, 208 Cal.App.3d 1297, 1305 (1989); *RRX Industries, Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 546 (9th Cir. 1985), and determine "whether [its] predominant factor, [its] thrust, [its] purpose, reasonably stated, is the rendition of

service, with goods incidentally involved . . . or is a transaction of sale, with labor incidentally involved." *United States ex rel. Bartec Industries, Inc. v. United Pacific Co.*, 976 F.2d 1274, 1277 (9th Cir. 1992). "The issue of mixed or hybrid goods and services often arises in the context of transactions involving software." *TK Power, Inc. v. Textron, Inc.*, 433 F.Supp.2d 1058, 1061-62 (N.D.Cal. 2006). "Because software packages vary depending on the needs of the individual consumer, [the Ninth Circuit] appl[ies] a case-by-case analysis." *RRX Industries*, 772 F.2d at 546.

### III. DISCUSSION

1.  Second Claim for Relief: Breach of Warranty of the SDA

    Multiple courts have considered how to treat software contracts under the UCC, but there is no authority from the highest courts of California or New York or from the Ninth Circuit that controls the instant dispute. Another court in this district recently concluded that a contract that provided for the development of a prototype was a contract for services, noting that the losing party had "not cited a single case in which a prototype or model for development purposes has been deemed 'goods' for purposes of applying the UCC." *TK Power*, 433 F.Supp.2d at 1062. That court also held that any portion of the contract that involved services was severable and that the UCC would not apply to that portion of the contract. *Id.* at 1063-64. The facts of the instant case differ from those of *TK Power*, however. The SDA contemplates not the creation of a prototype or model for development purposes, but rather the development of a final product for reproduction and distribution to Rockwell Software's customers. Accordingly, the Court has reviewed cases from other districts to inform its analysis.

    The two cases most factually similar to the instant case are *Pearl Investments, LLC v. Standard I/O, Inc.*, 257 F.Supp. 2d 326, 353 (D.Me. 2003) and *Architectronics, Inc. v. Control Systems, Inc.*, 935 F.Supp. 425, 432 (S.D.N.Y. 1998).[7] In *Pearl Investments*, the parties agreed that the developing party would "create [the] software from scratch (concept to realization) for which it would be paid on a time and materials basis. *Pearl Investments*, 257 F.Supp.2d at 353.

---

[7] Rockwell Automation does not attempt to distinguish *Pearl Investments*, which is cited by Versant in its motion. Neither party cites *Architectronics*.

The court concluded that "for purposes of applicability of the UCC, development of a software system from scratch primarily constitutes a service." *Id. Architectronics* involved two licenses, of which the primary one allowed the licensee to mass-market the prototype developed by the licensor. The court concluded that because the parties bargained for the right to mass-market the product, "not for the right to install single copies of the [software] onto their own PCs," the predominant feature of the transaction was a transfer of intellectual property rights, not a sale. *Architectronics*, 935 F.Supp. at 432. *See also Multi-Tech Systems, Inc. v. Floreat, Inc.*, 2002 WL 432016 (D.Minn. 2002) (unpublished) (following *Architectronics* in holding that "[c]ontribution of knowledge and expertise to the development of a product is not 'goods' within the meaning of the UCC").

This Court concludes that, as in *Architectronics* and *Pearl Investments,* the SDA is not governed by the UCC. The essence or thrust of the SDA is Versant's development of software from scratch and the granting of a license to Rockwell Software.[8] The SDA does not call for Versant to sell a slightly modified version of existing software to Rockwell Software. Instead, under the SDA, Versant must develop new software to supplement existing Rockwell Software software. The SDA then calls for Versant to provide the source code to an escrow agent, not to give a certain number of physical copies directly to Rockwell Software. Importantly, the SDA provides that Versant retains all ownership rights to the software. The SDA may have been formed with the ultimate purpose of creating software that Rockwell Software could sell as goods to its customers, but that purpose does not transform a development contract into a contract for a sale of goods. The analogy, proposed at oral argument by Rockwell Software, of the sale of a Windows CD at Best Buy is not appropriate for the transaction contemplated by the SDA. The essence of a license for the mass-produced Windows is different from the essence of a license of software developed from scratch to the requirements of the licensee. The Court is not willing to adopt what would likely amount to a per se rule that software development contracts are governed by the UCC. Instead, the Court has undertaken the case-by-case analysis required

---

[8] The SDA also provides for a maintenance and service contract that falls outside the scope of the UCC.

by the Ninth Circuit and concludes that the SDA is not a contract for the sale of goods, but rather is a transaction for services and for the transfer of intellectual property rights.

The cases cited by Rockwell Automation are distinguishable and not controlling. Unlike the instant case, which involves the development of new software, *Micro Data Base Systems, Inc. v. Dharma Systems, Inc.*, 148 F.3d 649 (7th Cir. 1998) involved a transaction where the customization of the software was only a small part of the transaction. *See id.* at 655 (comparing the case to a situation where the plaintiff bought a car from the defendant for $20,000, which included $1,000 for customization).[9] *Advent Systems Ltd. v. Unisys Corp*, 925 F.2d 670 (3d Cir. 1994) also involved a contract that contemplated limited customization of existing software and the sale of twenty different types of hardware. *See id.* at 674.[10] *Comshare, Inc. v. United States*, 27 F.3d 1142 (6th Cir. 1994) includes only a passing discussion of software and the UCC. *See id.* at 1145 fn.2. *RRX Industries Inc. v. Lab-Con, Inc.*, 772 F.2d 543 (9th Cir. 1985) involved the installation of a preexisting software system with minimal service. *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 742-43 (2d. Cir. 1979) pertained to the sale of hardware systems, not the development of software.

*Colonial Life Insurance Co. v. Electronic Data Systems Corp.*, 817 F.Supp. 235 (D.N.H.

---

[9] Rockwell Automation points out that the Seventh Circuit states that its opinion is consistent with the weight of authority. Opposition 3 (citing *Dharma*, 148 F.3d 654). However, since the *Dharma* opinion is distinguishable, a finding that the UCC is inapplicable to the instant case is not contrary to this weight of authority. Moreover, even if *Dharma* were not distinguishable, the decisions in *Pearl Investments* and *Architectronics* would indicate a shift in the weight of authority.

[10] *Unisys* includes a broad discussion of the law of software and the UCC. This discussion is mostly dicta, as the court decides the question on the basis that the contract's main objective was to transfer products, *Unisys*, 925 F.2d at 676, not on the basis of a broad rule regarding the application of the UCC to software and software development contracts. Rockwell Automation cites *Unisys*, 925 F.2d at 675 for the analogy that "when a professor delivers a lecture, it is not a good, but, when transcribed as a book, it becomes a good." However, the Court concludes that in the instant case, providing the new, custom software to the escrow agent is analogous not to the mass-produced book, but rather to the lecture and the preparatory work that the professor presumably performed. *See also Architectronics*, 935 F.Supp. at 432 n.5 (describing the more analogous hypothetical situation where a publisher commissions a novel, and finding such a situation a contract for services).

8

1993) involved an agreement in which "[the defendant] was to spend four years developing and customizing its Insurance Machine for [the plaintiff]. At the end of this term [the plaintiff] was to receive a license to use the system." *Id.* at 239. The court concluded that the "essence of the contract was to license [the plaintiff] to use a computer software product," *id.*, and that such a contract was a contract for goods within the meaning of the UCC. *Id.* However, *Colonial Life* is distinguishable from *Architectronics* and the instant case because that case involved the licensing and installation of software onto the licensee's own machines for its own use, not the grant of a license to reproduce the software and sell it to customers. Such a transaction indeed is more analogous to the sale of a license to a Windows user by Best Buy than to the complicated licensing and royalty agreement entered into by the parties to the instant dispute. To the extent that the instant case and *Architectronics* are not distinguishable from *Colonial Life*, the Court reaches the same result as the *Architectronics* court because the essence of the SDA was the application of Versant's skill and expertise to the software challenges facing Rockwell Software, not the sale of goods.

Accordingly, the Court will dismiss the second claim for relief. Rockwell Automation stated at oral argument that the applicability of the UCC to the SDA turned on the Court's interpretation of the terms of the SDA and that it cannot allege any further terms or facts that would impact the applicability of the UCC. Accordingly, the Court concludes that amendment of the second cause of action would be futile.

2.      Third Claim for Relief: Breach of Warranty of the Proposal

The parties agreed at oral argument that the UCC applies either to both the Proposal and the SDA or to neither. Because it concludes that the UCC does not apply to the SDA, the Court also concludes that the UCC does not apply to the Proposal, and it will dismiss the third claim for relief without leave to amend.

### IV. ORDER

Good cause therefore appearing, IT IS HEREBY ORDERED that the partial motion to dismiss the second and third causes of action in the First Amended Third Party Complaint is GRANTED without leave to amend.

1 | DATED: January 26, 2007.

_____
JEREMY FOGEL
United States District Judge

Case No. C 03-02232 JF (RS)
ORDER GRANTING PARTIAL MOTION TO DISMISS WITHOUT LEAVE TO AMEND
(JFLC1)

1  This Order has been served upon the following persons:

2  Alexander L. Brainerd          alexander.brainerd@hellerehrman.com,
                                  robin.ramirez@hellerehrman.com;
3                                 katherine.coleman@hellerehrman.com

4  Rodger R. Cole                 rcole@fenwick.com, vpieretti@fenwick.com

5  Kimberly K. Dodd               kdodd@foley.com, rbarcena@foley.com

6  Daniel L. Feder                danfeder@pacbell.net

7  Nancy J. Geenen                ngeenen@foleylaw.com, rbarcena@foleylaw.com

8  Annette L. Hurst               annette.hurst@hellerehrman.com, mawilliams@hewm.com

9  Christopher A. Keele           cakeele@stoel.com, gsbeasley@stoel.com

10 Rachael Gayza Samberg          rsamberg@fenwick.com, jwebb@fenwick.com

11 William M. Sloan , Esq         wmsloan@stoel.com,

12 Colbern C. Stuart , III        cole.stuart@hellerehrman.com, liz.hoke@hellerehrman.com

13
   Notice will be delivered by other means to:
14
   Christopher G. Hanewicz
15 Heller Ehrman LLP
   One East Main Street
16 Suite 201
   Madison, WI 53703-5118
17
   Leslie Harvey
18 Heller Ehrman LLP
   333 Bush Street
19 San Francisco, CA 94104

20 Molly A. Terwilliger
   Heller Ehrman LLP
21 701 Fifth Avenue
   Suite 6100
22 Seattle, WA 98104-7098

11

Case No. C 03-02232 JF (RS)
ORDER GRANTING PARTIAL MOTION TO DISMISS WITHOUT LEAVE TO AMEND
(JFLC1)